```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
DANA M. BRUER,

                    Plaintiff,
                                        MEMORANDUM & ORDER
         -against-                      13-CV-5814(JS)

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                    Defendant.
----------------------------------X
APPEARANCES
For Plaintiff:      John W. DeHaan, Esq.
                    DeHaan Busse LLP
                    300 Rabro Drive East, Ste. 101
                    Happauge, NY 11788

                    Kenneth S. Beskin, Esq.
                    Sherman, Federman, Sambur & McIntyre, LLP
                    8 East Main St.
                    Bay Shore, NY 11706

For Defendant:      Candace Scott Appleton, Esq.
                    United States Attorney's Office
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, NY 11201
```

SEYBERT, District Judge

Plaintiff Dana M. Bruer ("Plaintiff") commenced this action pursuant to Section 205(g) of the Social Security Act, as amended (the "Act"), 42 U.S.C. § 405(g), challenging Defendant the Commissioner of Social Security's (the "Commissioner" or "Defendant") denial of Plaintiff's application for disability insurance benefits. Presently before the Court are: (1) Defendant's motion for Judgment on the Pleadings pursuant to

Federal Rule of Civil Procedure 12(c) (Docket Entry 13); and (2) Plaintiff's cross-motion for Judgment on the Pleadings pursuant to Federal Rule 12(c) (Docket Entry 16). For the following reasons, Defendant's motion is GRANTED and Plaintiff's cross-motion is DENIED.

BACKGROUND

On November 10, 2010, Plaintiff filed an application for disability insurance benefits, asserting that she has been disabled and unable to work since July 19, 2009, due to hypothyroidism, headaches, fibromyalgia, and "back." (R. at 130-32, 139.)[1] Plaintiff's application was denied on May 26, 2011. (R. at 73-84.) Plaintiff requested a hearing before an administrative law judge ("ALJ"). (R. at 85-86.)

A hearing took place before ALJ Seymour Rayner ("ALJ Rayner") on March 13, 2012. (R. at 37-69.) Plaintiff appeared in person, was represented by counsel, and was the only witness to testify. (R. at 37-69.) By decision dated March 19, 2012, ALJ Rayner denied Plaintiff's application, finding that she was not disabled within the meaning of the Act. (R. at 27-34.)

Plaintiff sought an appeal before the Appeals Council on March 30, 2012. (R. at 22-23.) On July 18, 2013, the Appeals Council granted Plaintiff's request for review of her

---

[1] "R." denotes the administrative record filed by the Commissioner on June 19, 2014. (Docket Entry 10.)

2

claim. (R. at 121-24.) On September 5, 2013, the Appeals Council denied Plaintiff's appeal. (R. at 1-6.)

Because the Court's review is limited to determining whether there is substantial evidence in the record to support ALJ Rayner's decision, Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991), the Court first reviews the administrative record. The Court's review of the record proceeds as follows: first, the Court summarizes the relevant evidence presented to ALJ Rayner; second, the Court reviews ALJ Rayner's findings and conclusions; and third, the Court reviews the Appeals Council's decision.

I. Evidence Presented to ALJ Rayner

The Court first summarizes Plaintiff's testimonial evidence and employment history before turning to Plaintiff's medical records.

A. Testimonial Evidence and Employment History

Plaintiff was born in 1970. (Pl.'s Br., Docket Entry 16-1, at 1.) She graduated high school and attended approximately four years of college. (R. at 140.) Plaintiff worked as a direct care aid from January 1990 to January 2001, and then as a licensed practical nurse from July 2001 to July 2009. (R. at 140.)

Plaintiff testified that she initially injured her back on November 6, 2001, while working as a direct care counselor. (R. at 41.) Plaintiff stated that she did not work

after that incident until 2005. (R. at 43.) She continued to work until July 2009, when she stopped because of pain in her neck, back, and shoulder, as well as increased headaches. (R. at 43, 46.)

Plaintiff explained that she experiences daily pain that gets progressively worse throughout the day. (R. at 46.) She takes pain medicine twice per day, but it only decreases her pain "for an hour or two." (R. at 46-47.) As a result of this pain, Plaintiff is only able to sit for about forty minutes before needing to stand and stretch her back. (R. at 48.) Additionally, her pain becomes "excruciating" if she sits for too long, and she therefore spends about six hours a day lying down. (R. at 49.) The pain sometimes causes her to lose her train of thought and impairs her ability to read. (R. at 53.)

Plaintiff lives with her mother. (R. at 50.) She stated that it typically takes her about 20 to 30 minutes to get out of bed and that she sometimes goes four or five days without showering. (R. at 50.) She does not do any household chores and only drives once or twice a month locally. (R. at 51-52.) She is unable to bend over to tie her shoes, and the most she is able to lift is a half-gallon of milk. (R. at 57-58.) She occasionally goes to the movies and restaurants with her friends and family. (R. at 64.) She also testified that she took a car

4

trip to Maine, but had to take many stops on the way. (R. at 65)

B. <u>Medical Evidence</u>

In addition to Plaintiff's testimony, ALJ Rayner also reviewed all of Plaintiff's medical records. Plaintiff received her medical treatment and diagnoses from two medical professionals: (1) Dr. Shafi Wani, M.D., a board certified neurologist, and (2) Mr. Thomas Miceli, a chiropractor.

Dr. Wani saw Plaintiff twenty times between January 8, 2010 and February 9, 2012. (R. at 163, 170-77, 206-11, 230-45.) Dr. Wani did not opine that Plaintiff was unable to work or care for herself at any time before January 5, 2012. (R. at 163, 170-77, 206, 210-11, 230-45.) Indeed, Plaintiff routinely described her pain as moderate--either a "four" or "five" on a one-to-ten scale. (R. at 163, 170-77, 206, 210-11, 230-45.) Dr. Wani diagnosed Plaintiff with chronic pain syndrome and chronic cervical radiculopathy, which manifested in a moderate amount of stiffness and difficulty with neck motion. (R. at 163, 170-77, 206, 210-11, 230-45.) Dr. Wani treated Plaintiff with a series of trigger point injections and noted several times that she responded well to that treatment. (R. at 170-72, 210, 234-39, 242-44.)

Plaintiff first visited Dr. Wani on January 8, 2010. (R. at 176.) During this visit, Plaintiff complained of

5

stiffness and tenderness in her neck and shoulders, and described her pain as a "four" on a one-to-ten scale. (R. at 176.) Dr. Wani diagnosed Plaintiff with chronic cervical radiculopathy and suggested a follow-up appointment four weeks later. (R. at 176.) Plaintiff returned to Dr. Wani on February 4, 2010, for an examination. (R. at 177.) Plaintiff complained of continued discomfort in her neck and shoulders, this time rating her pain level at a five. (R. at 177.) Dr. Wani noted that Plaintiff's medications were providing her with moderate relief and diagnosed her with "chronic pain syndrome of the cervical spine." (R. at 177.)

On July 7, 2010, Plaintiff again saw Dr. Wani due to complaints of neck pain associated with numbness in her hands. (R. at 173.) Dr. Wani diagnosed her with chronic cervical pain with radiculopathy, and recommended that she continue her treatment. (R. at 173-74.)

Plaintiff saw Dr. Wani on January 28, 2011, and complained of neck pain associated with numbness, along with a "tingling in her upper extremities into her hands." (R. at 163.) Plaintiff described her pain level as a six out of ten. (R. at 163.) Dr. Wani again performed an examination and diagnosed Plaintiff with chronic cervical radiculopathy, but noted that her condition was stable. (R. at 163.) Dr. Wani

6

also stated that Plaintiff "is able to perform activities of daily living." (R. at 163.)

On March 17, 2011, Plaintiff received trigger point injection therapy from Dr. Wani in her cervical, shoulder, and posterior chest wall muscles. (R. at 170.) Dr. Wani's physical exam of Plaintiff revealed a "moderate amount of stiffness and tenderness" in the treated areas, as well as "difficulty with neck motion." (R. at 170.) Dr. Wani again diagnosed Plaintiff with chronic cervical radiculopathy, but noted that her range of motion was normal after the procedure was completed. (R. at 170-71.)

Plaintiff again received trigger point injection therapy from Dr. Wani on April 7, 2011. (R. at 210.) Dr. Wani stated that Plaintiff was receiving physical therapy and medication without getting complete relief but was responding well to the injection therapy. (R. at 210.) Upon examination, Dr. Wani again noted that Plaintiff had stiffness and tenderness in her cervical, shoulder, and posterior chest muscles, along with difficulty moving her neck. (R. at 210.) At her follow-up visit on April 28, 2011, Plaintiff complained of neck and shoulder pain, but stated that she had a good response to the trigger point injections. (R. at 244.) Dr. Wani again noted stiffness and tenderness in Plaintiff's cervical and shoulder

7

muscles, and suggested she continue trigger point injection therapy. (R. at 244-45.)

On May 5, 2011, Plaintiff again received trigger point injections from Dr. Wani, who noted similar findings as during previous visits. (R. at 242.) Plaintiff returned to Dr. Wani for follow-up visits on May 27, 2011, and July 22, 2011. (R. at 240-41.) Dr. Wani noted continued stiffness and tenderness in Plaintiff's cervical and shoulder muscles. (R. at 240-41.) Dr. Wani administered trigger point injections to Plaintiff on seven occasions. (R. at 170, 210, 23, 237-39, 242.) On October 12, 2011, Dr. Wani diagnosed Plaintiff with "chronic posttraumatic cervical myofascial pain and dysfunction," but continued to note Plaintiff's good response to trigger point injections. (R. at 237-39.)

During a visit with Dr. Wani on December 1, 2011, Plaintiff continued to complain of pain throughout her neck, but again stated that the trigger point injections continued to give her relief. (R. at 235.) Dr. Wani again noted tenderness and stiffness in Plaintiff's cervical muscles, as well as shoulder abduction being "decreased bilaterally with pain." (R. at 235.) Dr. Wani administered trigger point injections to Plaintiff again on December 22, 2011. (R. at 234.) On January 5, 2012, Plaintiff returned to Dr. Wani for a follow-up appointment and complained of "continued pain, stiffness, tightness along with

headaches" and difficulty sleeping. (R. at 232.) Dr. Wani increased Plaintiff's medication dosage. (R. at 233.) He stated for the first time that Plaintiff was unable to work and that she had difficulty with normal daily activities. (R. at 233.) Plaintiff saw Dr. Wani again on February 9, 2012, for a reexamination, which produced similar results to past visits. (R. at 230-31.)

Concurrently with her visits to Dr. Wani, Plaintiff regularly saw chiropractor Thomas Miceli. (R. at 178-205, 246-67.) Plaintiff frequently described higher levels of pain to Mr. Miceli than to Dr. Wani, often describing her pain as a "six" or "eight" out of ten. (R. at 178, 194.) Mr. Miceli diagnosed Plaintiff with a cervical sprain/strain and a thoracic sprain/strain. (R. at 179.) Mr. Miceli's reports of Plaintiff's condition remained relatively consistent but did note improvements during Plaintiff's visits in April 2011. (R. at 246-49.)

Plaintiff first saw Mr. Miceli on June 6, 2008, for a diagnostic evaluation of "lumbar spine related problems" related to her initial injury in 2001. (R. at 178.) Mr. Miceli continued to monitor Plaintiff's condition.

Plaintiff saw Mr. Miceli six times in January 2010. (R. at 178-86.) At her first visit, Mr. Miceli noted that Plaintiff reported significantly increased neck and upper back

9

pain, as well as an increase in her neck and lower back spasms. (R. at 178.) Plaintiff further described her pain level as an eight out of ten. (R. at 178.) Mr. Miceli conducted a series of both orthopedic and neurological tests that showed Plaintiff had several impairments, leading Mr. Miceli to diagnose Plaintiff with a cervical sprain/strain and a thoracic sprain/strain. (R. at 179.) He also described Plaintiff's condition as "chronic and permanent." (R. at 179.) Plaintiff next visited Mr. Miceli on January 15, 2010 and stated she experienced a slight reduction in her cervical and thoracic pain, as well as a reduction in her neck and back spasms. (R. at 179-180.) On January 20, 2010, Plaintiff again visited Mr. Miceli and complained of a slight increase in her neck pain and back pain, along with increases in her neck and back spasms. (R. at 181.) Mr. Miceli's assessment remained unchanged. (R. at 181.) Plaintiff reported no changes in her condition during her visits with Mr. Miceli on January 22 and January 27, 2010, (R. at 181-83.) On January 29, 2010, Mr. Miceli again performed "a complete, biomechanical, neurological and orthopedic work up" on Plaintiff. (R. at 184.) Mr. Miceli described Plaintiff's condition as "extremely chronic and permanent." (R. at 185.)

Plaintiff visited Mr. Miceli twice in March 2010, and reported that her condition was generally unchanged. (R. at 187-88.) Mr. Miceli again performed a full examination that

10

produced similar results to the pervious examinations. (R. at 188.) Plaintiff stated that she continued to suffer from "severe inflexibility" with "dull pain." (R. at 188.) She further stated that her neck pain was aggravated by turning her head and her back pain was aggravated by actions such as "bending, carrying, driving, pulling, sleeping, and walking." (R. at 188.) Plaintiff also stated that she is made comfortable after taking her medication and receiving chiropractic adjustments. (R. at 188.)

Plaintiff returned to Mr. Miceli in August 2010. (R. at 191.) First, on August 4, 2010, she reported that she felt mild improvements in her cervical and upper back pain, as well as improvements in her muscle and upper back spasms. (R. at 191.) Mr. Miceli noted findings similar to that of previous visits and diagnosed Plaintiff with "an acute exacerbation of a chronic condition." (R. at 191.) Then on, August 10 and August 18, 2010, Plaintiff told Mr. Miceli that her condition remained generally unchanged. (R. at 192-93.) Finally on August 20, 2010, Mr. Miceli performed another full examination of Plaintiff, recording similar results to her previous examination. (R. at 194.) During this visit, Plaintiff stated she felt slight improvements in her condition, and rated her pain level at six out of ten. (R. at 194.)

Plaintiff continued visiting Mr. Miceli in 2010, seeing him on October 6, and 22, November 3, 10, 17, and 24, and December 3, 17, 23, and 29. (R. at 192-205, 262-67.) Mr. Miceli continued to occasionally perform full range of motion examinations and did not note any major changes in Plaintiff's condition. (R. at 192-205, 262-67.) Mr. Miceli also met with Plaintiff on January 25, February 9, and March 4, 18, and 30, 2011, noting similar results to Plaintiff's previous visits. (R. at 250-60.) On April 11, 22, and 29, 2011, Plaintiff told Mr. Miceli that her neck and back impairments had improved by as much as 40%. (R. at 246-49.)

## II. ALJ Rayner's Decision

On March 19, 2012, ALJ Rayner found that Plaintiff was not disabled. (R. at 27-34.) ALJ Rayner concluded that although Plaintiff had severe impairments in the form of "cervical and thoracic spine sprains/strains," she still "had the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a)." (R. at 29-30.) In so concluding, ALJ Rayner complied with the five-step framework contemplated by the Act.[2]

---

[2] The Commissioner must apply a five-step analysis when determining whether a claimant is disabled as defined by the Act. See Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Petrie v. Astrue, 412 F. App'x 401, 404 (2d Cir. 2011). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). Second, the

In his analysis, ALJ Rayner afforded "significantly more weight" to Dr. Wani's orthopedic and neurological opinions, than Mr. Miceli's opinions. He explained that he did so because Mr. Miceli is not an orthopedist or neurologist. (R. at 31.) He also gave Mr. Miceli's overall opinon "little weight" because it was "inconsistent with the medical evidence and testimony considered as a whole." (R. at 32.)

III. <u>Appeals Council's Decision</u>

Plaintiff sought review of ALJ Rayner's decision by the Appeals Council. (R. at 22.) On September 5, 2013, the Appeals Council adopted ALJ Rayner's conclusion that Plaintiff was not disabled. (R. at 4-6.) The Appeals Council agreed with ALJ Rayner that Plaintiff could "lift 10 pounds occasionally and less than 10 pounds frequently as well as sit for six hours or stand and/or walk as much as two hours in an eight-hour work day." (R. at 5.) Despite concluding that Plaintiff could no

---

claimant must prove that he suffers from a severe impairment that significantly limits his mental or physical ability to do basic work activities. 20 C.F.R §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). <u>Third</u>, the claimant must show that his impairment is equivalent to one of the impairments listed in Appendix 1 of the Regulations. 20 C.F.R §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). <u>Fourth</u>, if his impairment or its equivalent is not listed in the Appendix, the claimant must show that he does not have the residual functional capacity to perform tasks required in his previous employment. 20 C.F.R §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). <u>Fifth</u>, if the claimant successfully makes these showings, the Commissioner must determine if there is any other work within the national economy that the claimant is able to perform. 20 C.F.R §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

13

longer perform her past work, the Appeals Council still deemed Plaintiff "not disabled" because of her capacity to perform a "full range of sedentary work." (R. at 5.)

DISCUSSION

The Court will first review the relevant legal standard before turning to Plaintiff's claims more specifically.

I. Standard of Review

In reviewing the ruling of the ALJ, this Court will not determine de novo whether Plaintiff is entitled to Social Security Insurance or disability benefits. Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ. See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991). Instead, this Court must determine whether the ALJ's findings are supported by "substantial evidence in the record as a whole or are based on an erroneous legal standard." Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000) (internal quotations marks and citation omitted), superseded by statute on other grounds, 20 C.F.R. § 404.1560(c)(2). If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists. See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a conclusion." Id. (citing

Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971)). The substantial evidence test applies not only to the ALJ's findings of fact, but also to any inferences and conclusions of law drawn from such facts. See id.

To determine if substantial evidence exists to support the ALJ's findings, this Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences may be drawn." See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotation marks and citation omitted). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).

## II. Plaintiff's Contentions

Plaintiff argues that ALJ Rayner erred in finding that Plaintiff is not disabled because: (1) ALJ Rayner failed to consider all of the medical evidence regarding Plaintiff's impairment, most notably the opinions of Mr. Miceli; and (2) ALJ Rayner selectively reviewed Dr. Wani's reports and failed to develop the record with evidence beyond his opinions. The Court addresses these arguments separately.

### A. Weight Given to Mr. Miceli's Opinion

Plaintiff contends that ALJ Rayner failed to consider all of the medical evidence of Plaintiff's impairment,

15

specifically the medical records supplied by Mr. Miceli, Plaintiff's chiropractor. (Pl.'s Br. at 17.) The Court disagrees.

Under, 20 C.F.R. § 404.1527, ALJ Rayner has the discretion to determine how much weight to afford to a medical source that is not an "accepted" medical source. The Second Circuit has held that "under no circumstances can the regulations be read to <u>require</u> the ALJ to give controlling weight to a chiropractor's opinion." <u>Diaz v. Shalala</u>, 59 F.3d 307, 314 (2d Cir. 1995) (emphasis in original).

As a chiropractor, Mr. Miceli is not an accepted medical source under 20 C.F.R. § 404.1513. Consequently, ALJ Rayner had discretion to determine how much weight should be accorded to Mr. Miceli's opinion. 20 C.F.R. § 404.1527.

In any event, it cannot be said, as Plaintiff argues, that ALJ Rayner "glossed over" the treatment records of Mr. Miceli. (Pl.'s Br. at 17.) ALJ Rayner stated that he gave "little weight" to Mr. Miceli's opinion after considering "the totality of the evidence." (R. at 32.) Further, ALJ Rayner went on to state that he was affording Mr. Miceli's opinion "little weight," because it was inconsistent with the remainder of the record. (R. at 32.) ALJ Rayner did not ignore Mr. Miceli's records; he made a calculated decision to afford them

16

less weight than Plaintiff would have liked.  Such a decision falls well within his discretion.

Plaintiff also argues that ALJ Rayner somehow erred when he chose to give more weight to Dr. Wani's opinions because he "fail[ed] to actually state how much weight he gave to the neurologist's opinion, and instead merely stated that he was giving the doctor's reports 'significantly more weight' than the treating chiropractor . . . ."  (Pl's Br. at 13.)  That ALJ Rayner expressed his deference to Dr. Wani in relative rather than absolute terms gives the Court no pause.  Further, ALJ Rayner's statement that Dr. Wani's orthopedic and neurological opinions were given "significantly more weight" than that of Dr. Miceli, is consistent with the way ALJs have expressed the amount of weight accorded to a doctor's opinion in the past.  <u>Sisto v. Colvin</u>, No. 12-CV-2258, 2013 WL 4735694, at *9 (E.D.N.Y. Sept. 3, 2013) (affirming denial of Social Security benefits where an ALJ noted he was according "extra weight" to a doctor's opinions).[3]

---

[3] ALJ Rayner's crediting Dr. Wani, who treated Plaintiff for over two years, constitutes textbook adherence to the treating physician rule, which requires that an ALJ look at various factors and give good reasons for the weight accorded to a claimant's treating source, when not according the source controlling weight.  20 C.F.R. 404.1527(c).  Thus, to the extent Plaintiff's papers can be interpreted as a specious challenge under the treating physician rule, it is denied.

17

B. ALJ's Consideration of Dr. Wani's Reports

Plaintiff further argues that ALJ Rayner's consideration of Dr. Wani's opinions was flawed for two reasons: (1) ALJ Rayner failed to consider Dr. Wani's January 5, 2012 opinion that Plaintiff was unable to work; and (2) ALJ Rayner failed to properly develop the record where Dr. Wani's opinions were lacking. (Pl.'s Br. at 14-15.)

Dr. Wani indicated on January 5, 2012 that Plaintiff was unable to work. (R. at 233.) Because this opinion came after Plaintiff's date last insured, ALJ Rayner deemed it of little probative value to whether Plaintiff was entitled to disability insurance benefits.[4] Plaintiff argues that although this opinion was given after Plaintiff's date last insured, it should have been considered to the extent it clarifies Dr. Wani's previous opinions and assessments. (Pl. Br. at 14.) However, an ALJ must only consider medical opinions given after a claimant's date last insured if "such opinions are relevant to her condition prior to that date." Dailey v. Barnhart, 277 F. Supp. 2d 226, 233 n.14 (W.D.N.Y. 2003). Here, Dr. Wani stated on January 5, 2012, that "[a]t this time, [Plaintiff] is unable to

---

[4] In order to be eligible for benefits, a claimant must be insured at the time in which they are deemed disabled. 20 C.F.R. § 404.131. ALJ Rayner cited Plaintiff's date last insured as December 31, 2010. (R. at 29.) However, it was noted by the Appeals Council that Plaintiff's actual date last insured was March 31, 2011. (R. at 4.)

18

work." (R. at 233 (emphasis added).) Thus, the statement itself limits the opinion of Plaintiff's condition to that date. Dr. Wani did not opine on Plaintiff's ability to work at any other time. Therefore, ALJ Rayner's not considering this opinion in his decision was appropriate.

Plaintiff goes on to contend that ALJ Rayner failed to develop the record regarding Dr. Wani's opinion on Plaintiff's ability to work during the period during which she was insured. (Pl.'s Br. at 15.) ALJ Rayner has the duty to develop a complete medical record of the claimant. 20 C.F.R. § 404.1512(d). This includes making a request for evidence from a medical source and then one follow-up request. 20 C.F.R. § 404.1512(d)(1).

The record indicates that Dr. Wani was initially contacted by ALJ Rayner on March 28, 2011, and then again on April 11, 2011, and was provided with a form on which he was asked to assess Plaintiff's functionality during her insured period. (R. at 227.) Dr. Wani returned the form without answering any of the questions and simply instructed ALJ Rayner to refer to the medical records that were provided. (R. at 212-20.) In doing so, Dr. Wani provided a complete medical history of his treatment of Plaintiff, including his opinion of Plaintiff's condition at each visit. The fact that Dr. Wani did not give an opinion as to Plaintiff's functionality during her

19

insured period did not make the record incomplete. 20 C.F.R. § 404.1513(b)(6). Therefore, ALJ Rayner adequately fulfilled his duty to develop Plaintiff's medical record.

Accordingly, the Court finds both that Plaintiff's conventions on appeal lack merit, and, more importantly, that the administrative records contains substantial evidence to support ALJ Rayner's decision.

CONCLUSION

For the foregoing reasons, Defendant's cross-motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c) (Docket Entry 16) is GRANTED, and Plaintiff's motion for Judgment on the Pleadings pursuant to Federal Rule 12(c) (Docket Entry 13) is DENIED. The Clerk of the Court is directed to enter judgment in accordance with this Memorandum and Order and to mark this matter CLOSED.

SO ORDERED

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Date: July __30__, 2015
     Central Islip, New York